## THE ILLINOIS CENTRAL RAILROAD COMPANY
### v.
### SAMUEL BROOKSHIRE.

1.  EVIDENCE—IRRELEVANCY.—The declaration containing no allegation or charge against the appellant, of negligence by reason of running the engine at a high rate of speed, it was error to admit evidence tending to show the speed with which the engine was running at the time of the alleged injury.

2.  CONTRIBUTORY NEGLIGENCE.—Where the plaintiff's own act contributed to the injury, he cannot recover unless his negligence was slight, and that of the defendant gross in comparison. So, where it appears that the plaintiff was injured by a truck being struck by a passing engine, and it also appears that but for the plaintiff's act in pushing the truck around it would not have been hit by the engine, this was such negligence on his part as will preclude his right to recover, unless it were gross negligence on the part of the railroad company in allowing the truck to remain in that position.

3.  RAILROADS—REMOVAL OF OBSTRUCTIONS.—The railroad company had provided a safe and convenient way of approach to the depot, and if the plaintiff could not with safety to himself proceed in the direction he had chosen it was his duty to have retraced his steps, and approached by the way provided by the company. The truck standing in a place appropriated by the company for its own use, and not intended for the use of the public, it was not an obstruction that it was bound to remove.

4.  NEGLIGENCE—A QUESTION FOR THE JURY—RULE AS TO.—What constitutes ordinary diligence and what is negligence are inquiries to be answered by a jury, but courts are bound to see that these facts when found by the jury rest upon evidence.

APPEAL from the Circuit Court of Union county; the Hon. MONROE C. CRAWFORD, Judge, presiding.

Messrs. GREEN & GILBERT, for appellant.

Messrs. LINEGAR & LANGSDEN, for appellee.

TANNER, P. J.    This is an appeal from a judgment obtained by Samuel L. Brookshire in an action on the case against the I. C. R. R. Co., for its alleged negligence in allowing a baggage truck to stand upon the sidewalk, with one end projecting over the railway track during the passing of locomotive, whereby he received personal injury.

The jury returned a verdict for seven thousand dollars; a motion for a new trial was overruled and judgment rendered for the amount of the verdict with cost.

To reverse this judgment the railroad company appeals, and assigns for error:

1st. The refusal of the court to carry the demurrer to the first plea back to the declaration.

In this we think there was no error. The declaration avers that the defendant " *carelessly* and *negligently* allowed the truck to project over the track," and this is all that seems to be required by approved precedents.

Hence, we are of opinion that the phraseology of the charging part of the declaration required of the appellee the same strictness of proof that would have been required had he alleged that the company knowingly permitted the truck to so stand.

Again, it is urged that improper testimony was admitted to go to the jury over the objection of the appellant. This error is well taken. Several witnesses were examined with reference to the speed with which the locomotive passed the platform or sidewalk, and some stated that its speed was very fast, This testimony was irrelevant, and doubtless had an influence upon the jury. The declaration charges no carelessness or negligence in operating the locomotive or train of cars at the time of the injury, and there being no allegation of negligence in this respect, the appellant had no notice that such testimony would be offered, therefore the testimony should have been rejected. I. C. R. R. Co. v. McKee, 43 Ill. 119. It is insisted. also, that the court erred in not granting a new trial. This brings us to an examination of the testimony. It appears that the passenger depot building at Anna, where the appellee received his injury, is located twenty feet east of the main track, and the space between the track and building is filled by a platform, which extends near one hundred feet south along the track; about one hundred feet further on, in the same direction, stands a water-tank, used to supply locomotives with water; its distance from the track is less than seven feet; a fence extends from the platform to the tank, running with and twelve feet from the track; below the platform and extending

near to the tank were two parallel planks, put down for the purpose of moving the truck (which belongs to and was used by the express company), from the platform to the place where it was kept when not in use—which was at the side of the fence, and close to the tank. Below, and close to the tank, from 1853 to 1863, the railroad company had a woodshed, and the space between it and the track was covered by a platform, used for the purpose of stacking wood to be used on its locomotives. About 1863 the use of wood was abandoned and the woodshed and platform were removed, and a cinder walk put down along the track and extending to a considerable distance south, for the convenience of the employes in operating the road. The proprietor of the hotel known as the "Winstead House," situated across the street, and east of the track, for the convenience of the patrons of the house, and transporting baggage, constructed a plank walk leading across the street and terminating at the tank. A suitable, convenient and safe way or approach leading eastward to and from the north end of the depot to the "European Hotel" was constructed and maintained by the company from 1853 to the time the appellee was injured. The citizens of Anna, however, used the way leading to the depot by the tank rather more than the one leading eastward, and without any objection being made by the company. The tank was located with reference to the wants and convenience of the company, more than twenty years prior, and the space between it and the railroad track was constantly wet, more or less, by leakage and by waste, at the time of supplying the locomotives, which occurred about eight times per day. The proper use of the tank rendered it impossible to fence or obstruct the way leading by it. The appellee was seventeen years old, a solicitor of patronage for the "Winstead House," visited seven trains per day, and always by the way of the tank. At the time of the injury he was running rapidly to meet an incoming train; he was cognizant of the existence and usual locality of the truck, and frequently used it himself in the transportation of baggage. The passing locomotive of appellant struck the truck and forced it and the appellee upon and through the side of the tank, breaking one leg and one arm, and rendering amputation of the latter limb necessary.

Of the foregoing facts there is no dispute. But as to the circumstances which led directly to the infliction of the injury, there is some discrepancy in the statements of the witnesses.

The appellee testifies: I was going from the Winstead House to the train at the time of the accident, in a trot; when I got to the corner of the tank I got caught with the truck; that the engine shoved through the wall of the tank; I did not see the truck until it struck me; the truck belonged to the express company; it was a long one with four wheels—two in the center and one at each end—but did not balance on center wheels; we used the truck to carry baggage to the hotel; I don't know that I used it alone, but I have helped to take it over quite a number of times.

John Lard testifies: I saw plaintiff going to the train; I heard a crash; went over; saw plaintiff lapped around a pair of trucks; they had caught him about the upper end of his leg and bent him over.

James Firestone says: Immediately preceding the accident I passed the trucks; they were between the track and tank, and stood diagonally; met the boy half-way between tank and Winstead House; I saw nobody about freight house except Mr. Bush; I walked on the track to go around one end of the truck; one end was kinder leaning towards the tank; one end was turned over towards the track a little; one end was leaning over towards the tank and one end was bearing towards the track; it looked like the handles were pretty close to the ties; the ties project more than fourteen inches beyond the iron rail; I can't fix any distance; it might have been six inches from the end of the ties, but can't say; the boy was going to the train in a trot, as he usually did.

Alfred Firestone states that about four or five minutes before the train arrived, he saw the truck on the platform. It was pretty near between him and the tank; it was somewhere along there; it was kind of between him and the tank; it was more up towards the upper end—the north end. The evidence of appellee and James Firestone is all that in anywise tends to support the charge as to the projection of truck. These witnesses are completely overwhelmed. John D. Windman states that

he had several conversations with appellee as to the accident, and he states that the truck was in a narrow passage near the tank, and he tried to push it out of the road. He thought he could do it before the train would strike it; but by moving it, he was caught by the train. John Allen states that on the morning following the accident, he went to appellee and asked him how it occurred, and appellee said he was running to the caboose after passengers; and when he passed the south end of the tank the truck was there, and he took hold of it to move it out of the way, and it caught in the engine and run him through the tank.

A. M. Stone testifies: I saw the boy the next morning after he got hurt, and he told me he was running to the caboose for passengers, and went around the tank, and thought there was not room enough to get by the truck, and he caught hold of it to turn it a little, and turned it too far, and the tender step caught it. The witness further stated that he was the engineer driving the locomotive that collided with the truck; that he saw the truck as the train was approaching, and looked at it to determine whether it was close enough to the track to be in the way of his engine, and he was satisfied it was not.

George Galvin states he saw the boy have hold of the truck, and was backing some four or five steps with it, and all of a sudden it went through the tank; he must have been two or three feet north of the tank when my eye fell on him backing the truck.

A. D. Bush states that, right after the accident I went and examined the tank; the marks on it were made by the handles scraping against it.

James Collins testifies: As the train was coming in I saw Samuel Brookshire come running around the corner of the tank; I was twenty-five or thirty feet north of the tank; the truck was standing straight with the track—I mean parallel with it; it was some distance from the track, outside of the end of the ties; saw Brookshire run up to the truck, and his hand touched the right handle of the truck, when it swung around and the step of the tender struck it and that knocked him down, and as he got half way up, some part of the box-car

struck it and knocked him through the tank; can't say whether he took hold of it or just pushed it; I simply saw him put his hand on the truck, then it swung around and came in collision with the step of the tender.

William King: I noticed the truck as the train was coming in; it stood about two feet from the track and parallel with it, and a little north of the tank; my judgment is that the train would not have struck it; I could see it perfectly plain.

William Kratzinger: I examined the tank soon after Brookshire was hurt; it struck first on the northwest corner of the tank; it broke off the two next batten, and then broke into the house.

James Brookshire, father of the appellee, in rebuttal, states: I was in the room when Allen and Stone came there, the morning after the accident; if Samuel said anything to them about having taken hold of the truck to push it, I did not hear it; I was sitting on one side of the bed and they were on the other; if that conversation had taken place, I think I would have heard it.

Samuel Brookshire recalled: I heard the expression of Stone and Allen; I did not make use of any such expression; I do not know of having any conversation with Mr. Windman; I may have told him I took hold of the truck to save myself.

The foregoing is substantially all of the testimony upon the disputed points, and from it we do not hesitate to hold that it does not warrant the verdict and judgment against the appellant.

The way leading to the depot by the tank was not prepared for the use of the public, but solely for the convenience of the servants of appellant in the operation and management of the road. The tank could not be conveniently located at a greater distance from the railroad track. It furnished water to every train passing upon the road. The space between it and the road was kept constantly wet by leakage and waste-water. From these causes it could not be rendered adequate to the wants of the public in its intercourse with the appellant. From the time the depot was constructed to the time of the injury of the appellee, the appellant maintained a good, convenient

and safe approach to its depot, in an easterly direction, for the accommodation of the traveling community; and although the citizens of the south part of the city used this way in going to and from the depot without protest, the appellant's right to its enjoyment was not thereby lost or abridged. The use of the truck on this route was incidental to the business of the company, and this was known to the appellee.

The appellant in nowise invited the public to the use of this route to its depot, and we think was in nowise required to keep it clear of obstructions. If the truck impeded the appellee in his going to the depot, he should have retraced his steps and proceeded by the approach prepared and maintained for the purpose by the appellant—which was only about thirty yards further—but he elected to attempt a removal of the truck, and by so doing directly contributed to bring upon himself the injury. So long as no motive power was applied to the truck, no injury of the character complained of could have happened; and if the company was under no obligations to remove the obstruction, appellee could not remove it and complain of injury thereby incurred.

The truck stood upon the walk north of the tank, and parallel, or nearly so, with the line of the railroad track, and was brought in contact with the locomotive or tender by motive power, carelessly applied by the appellee. No negligence is charged to the appellant in the management of the locomotive by its servants. Now, if it were negligence in allowing the truck to stand upon the sidewalk, or side-way, was it gross, or ordinary negligence?

We do not see how the injury which the appellee received could be reasonably foreseen or anticipated by the appellant in the standing of the truck upon the side-way between the tank and platform. No person was in peril from passing trains so long as it remained stationary, and no reasonable inference could be drawn as to the occurrence of an injury in the manner of that disclosed in this record, and hence we think the appellant cannot be said to have been guilty of gross negligence.

To enable the appellee to recover, his negligence should be slight when compared with that of the appellant, and his

gross. Schmidt v. Chicago and Northwestern R'y Co. 83 Ill. 405; I. C. R. R. Co. v. Hetherington, Ib. 511; I. C. R. R. Co. v. Hammer, 72 Ill. 348.

This rule of law in reference to comparative negligence, when applied to the evidence found in this record, impels us to interfere in behalf of the appellant, and when we do so, we are not unmindful that what constitutes ordinary diligence and what is negligence, are inquiries to be answered by a jury; but courts are bound to see that these facts, when found by a jury, rest upon evidence. Indeed, were it otherwise, our corporations, public and private, at times would be left to a hard fate. If courts, in their adjudications, could be guided by sympathy, the appellee would rest securely upon his judgment, but the stern mandates of justice render it otherwise.

There are various other errors assigned, but we think for the purposes of another trial they need not be considered. For the several errors indicated, the judgment of the Circuit Court will be reversed and the cause remanded.

Judgment reversed.